LITTLE ROCK & FORT SMITH RAILWAY V. McGEHEE.

1. **RAILROAD :**  *Rights as to mode of assessing damages for taking land.*
   The right of a railroad corporation to have the damages for the appropriation of land to its uses assessed in a particular mode, is not a franchise which passes to the purchaser of its property.   It is a personal privilege of the company and not transferable.

2. **SAME :**  *Damages for taking lands, how assessed.*
   When a railroad corporation has no vested right to a particular mode of assessing damages for appropriating lands for its uses, the owner of land taken by it may sue in trespass or other appropriate action and have his damages assessed by a jury.

3. **SAME :**  *Damages:   Value of lands, how estimated.*
   In determining the value of lands appropriated for public uses, the same considerations are to be regarded as in sales between private parties; the inquiry being in such cases, what from their availability for valuable uses, are they worth in the market.

4. **SAME :**  *Same.*
   As a general rule compensation to the owner for lands appropriated to public uses is estimated by reference to the uses for which the lands are suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the near future.
   (In this case the land appropriated was worthless for habitation or cultivation, but its prospective value for a ferry landing to be established in the future was allowed in the estimate of damages.—REP.) EAKIN, J. dissenting.

5. **SAME :**  *Satisfaction of judgment for damages:   Effect of.*
   When a railroad company has a right to build its road, satisfaction of a

judgment against it for appropriating lands for its uses will render the appropriation legal and protect the company from further actions for occupying the land; but if it has no right to build, then the road is a perpetual nuisance and every days continuance upon the land is a legal wrong for which the company is liable in damages.

APPEAL from *Crawford* Circuit Court.

Hon. J. H. ROGERS, Circuit Judge.

*Wm. Walker* and *B. J. Brown*, for appellant.

1. Plaintiff's remedy was by special proceedings under the act January 22, 1855. *C. & F. R. Co. v. Turner, 31 Ark., 494.* A satisfaction of any judgment rendered under this proceeding would not appropriate the land to the company, but the company would be liable to successive actions for a continuing nuisance. *24 N. Y., 658; 37 Ib., 472; 46 Wis., 625; 43 Ib., 183; 65 Maine, 140; 79 Penn. St., 71; 54 Ind., 314; 17 Minn., 215; 61 Miss., 359.*

2. The lands were not permanently injured, and when the possession is in a tenant under lease, the owner in fee cannot maintain the action for a nuisance or for injuries of a permanent character. *Wood Law of Nuisances, 863; Pierce on Railroads, 272.*

3. The measure of damages was the annual value of the land taken, and no damages for the injury to, or for value *present* or prospective of a *ferry privilege* should have been allowed. The verdict was excessive. *Wood Law of Nuisance, 870; Chitty on Pleadings, —; Sedgwick on Damages, —.*

The company was authorized by its charter to change its course after it was located, and to appropriate the lands on its new route.

*H. F. Thomason* and *Duval & Cravens*, for appellee.

SMITH, J. McGehee sued the railroad company in trespass for entering upon and appropriating his land for a right of

way. The cause was tried before a jury upon issue joined that the supposed trespasses were committed by leave and license of the plaintiff. There was a verdict and judgment for the plaintiff for four hundred dollars damages.

1. Right of railroad to mode of assessing damages not transferable.

Upon the threshold of this case, we are confronted by a claim that the act of January 22, 1855, (*Gould's Dig.*, ch. *140, secs. 1–4*), as construed in *C. & F. R. Co. v. Turner, 31 Ark., 494*, is decisive and that the plaintiff's sole remedy was by special proceedings under that statute to have his damages assessed in the first instance by five disinterested householders of the county. The Little Rock and Fort Smith Railroad Company was incorporated on the same day that this act was passed, and the corporation was subsequently organized and the road partially built under the provisions of its special charter. But it appears from the defendant's own pleadings and evidence, that prior to the trespasses in this action complained of, this railroad had been sold under a decree of foreclosure rendered by the United States circuit court for the Eastern District of Arkansas, and the purchasers at such sale had, under the general railroad incorporation law, formed a new corporation by name the Little Rock and Fort Smith Railway, which is the present defendant. Now the right of a railroad corporation to have the damages for the appropriation of land to its uses assessed in a particular mode is not a franchise which passes to a purchaser of its property. It is a personal privilege of the company and not transferable. *Morgan v. Louisiana, 93 U. S., 217; R. Co. v. County of Hamblen, 102 Id., 273; Wilson v. Gaines, 103 Id., 417; State v. Morgan, 28 La. Ann., 482.*

2. Damages for taking land how recoverable.

Consequently the plaintiff might sue in trespass or other appropriate action and have his damages ascertained by a jury. *Whitehead v. Ark. Cent. R. R. Co., 28 Ark, 460; Constitution of 1874, Art. XII., sec. 9.*

In support of its plea of leave and license, the defendant

produced the plaintiff's deed, executed in the year 1875, granting to it a right of way through the *locus in quo*, subject to the proviso that the road should pass along a specified route and be so located as not to interfere with the grantor's ferry right. And in 1876 the defendant had entered upon the land, had constructed its road-bed and had laid its track upon the line indicated and had so continued to operate its road until November, 1878, when, without the plaintiff's consent and without compensation to him, it abandoned its original route and bulit an incline through the plaintiff's land from the main bank of the Arkansas river to low-water mark. This incline was 1250 feet in length up and down the river, with a wharf or steamboat landing at its foot, and the company used a steamboat for transporting its locomotives across the river. The incline was, in fact, a section, part, or continuation of the defendant's railway. It did not pursue the route described in the deed along the high land on the river bank, but descended by a gentle grade to the water's edge; thus obstructing the approach to the river and injuriously affecting the ferry privilege. The plea of license is therefore not sustained by proof and the plaintiff's right to recover some damages is unquestionable.

This brings us face to face with the substantial question and real bone of contention in the case, viz: the amount of compensation which the owner of the land condemned is entitled to receive and the principle upon which it is to be estimated.

The evidence was that McGehee owned the river front for a quarter of a mile on the eastern or northern bank; that it was a rocky bluff, entirely unfit for cultivation or human habitation; that the land actually taken was only three or four acres, insusceptible of use for any profitable purpose except as a ferry landing; that the construction of the incline had practically destroyed its value for this last men-

3. Damages—Value of land, how estimated.

tioned purpose by obstructing the approach to the river; that no ferry had ever been established or operated on the plaintiff's land, and no license had been granted by the county court for such a ferry, but it was a very eligible site for a ferry by reason of the deep water at that point; that the plaintiff's land was less than one mile distant from the licensed ferry at Van Buren, which had been in operation ever since territorial times; that there was no public highway leading from any point to the land, but one could be constructed at a moderate expense from the town of Van Buren or from the Fayetteville road; that the Van Buren ferry labored under great disadvantages both at high and low stages of the water, on account of sandbars in the bed of the river and difficulties in the way of landing its boats; that the sole value which the plaintiff or anybody else attached to this tract of seventy-six acres, traversed by the defendant's incline, was on account of its suitableness for the establishment of a ferry; that he had always destined it to this use, and had once leased it for five years with a condition that the lessee should obtain a license and establish a ferry there within two years, or else surrender the premises; and that the plaintiff in granting the right of way to defendant over his land had expressly stipulated that the company should run its road along the high land so as not to interfere with the plaintiff's ferry right. The value of the land, before the construction of the incline, with the privilege of applying to the county court for a ferry license, was variously estimated from five hundred dollars to five thousand dollars, and its value since was nominal, say one hundred dollars.

The defendant moved to exclude all evidence relating to the feasibility of establishing a ferry from the plaintiff's land to the opposite bank. And it here contends that the adaptability of the land for the purpose of a ferry was not a proper element for consideration in estimating the value of

the land condemned, assuming that such adaptibility could never be made available to the plaintff by reason of supposed exclusive privileges in the proprietors of the Van Buren ferry ; or if it was competent for the county court to license a rival ferry near the town of Van Buren, that it was extremely problematical whether, if the incline had never been built, such license would have been granted and a ferry established by the present or any future owner of the land, and consequently the damages were too remote, speculative and inestimable by any standard approximating correctness.

A similar question came before the supreme court of the United States, in *Boom Co. v. Patterson, 98 U. S., 403.* The Boom Company was a corporation created under the laws of Minnesota to construct booms between certain designated points on the Mississippi and Rum rivers in that state. It was authorized to enter upon and occupy any land necessary for properly conducting its business; and where such land was private property, to apply to the district court of the proper county for the appointment of commissioners to appraise its value and take proceedings for its condemnation. Patterson was the owner of an island and parts of two other islands in the Mississippi river. The land owned by him amounted to a little over thirty-four acres, and the position of the islands specially fitted them, in connection with the west bank of the river, to form a boom of extensive dimensions, capable of holding with safety from twenty to thirty millions of feet of logs. This land the Boom Company sought to condemn for its uses ; and upon its application commissioners were appointed by the district court to appraise its value. The case finally got into the federal court. The jury found a general verdict assessing the value of the land at $9.358.33, but accompanied it with a special verdict assessing its value, aside from any consideration of its value for boom purposes, at $300, and in view of its adaptibility for those purposes, a

further and additional value of $9,058.33. The circuit court, under a threat of new trial, compelled the plaintiff to reduce his verdict to $5,500, and judgment was entered for that amount. Upon a writ of error, the judgment was affirmed. Mr. Justice Field, in delivering the unanimous opinion of the court, said: "In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be, what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted ; that is to say, what is it worth from its availability for valuable uses. Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated. So many and varied are the circumstances to be taken into consideration in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule ; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future. The position of the three islands in the Mississippi fitting them to form, in connection with the west bank of the river, a boom of immense dimensions, capable of holding in safety over twenty millions of feet of logs, added largely to the value of the lands. This Boom Company would greatly prefer them to more valuable agricultural

*General rule for estimating value of lands.*

lands, or to lands situated elsewhere on the river; as by utilizing them in the manner proposed, they would save heavy expenditures of money in constructing a boom of equal capacity. Their adaptability for boom purposes was a circumstance, therefore, which the owner had a right to insist upon as an element in estimating the value of his lands."

Our statute expressly recognizes in the owner of land fronting on a public navigable stream the liberty or privilege of keeping a boat for the transportation of men, horses and carriages with their contents for a reasonable toll, to be regulated by the county court. This is, indeed, not an absolute right, since the public have rights and interests in such a franchise; but a qualified right dependent for its exercise upon the consent of the state. And the power of determining whether a public ferry is demanded at any particular point by the necessities of travel and traffic is delegated to the county court. *Gantt's Dig.*, *Ch.* "*Ferries;*" *Cloyes v. Keatts, 18 Ark., 19*; *Murray v. Menefee, 20 Id., 561*; *Bell v. Clegg, 25 Id., 26*; *Haynes v. Wells, 26 Id., 464*.

But in this state there is no ferry franchise separate from the ownership of land. If public convenience requires a ferry at a certain place, the proprietor of the soil on one or both banks of the stream, or one holding by, through, or under him is to keep it. This preference is an incorporeal hereditament appurtenant to the land, descendible to heirs, and capable of being leased, sold or assigned. It is, therefore, of some value, and if near a town, may be very valuable. Although no ferry may have ever been established there, it is possible, and may be probable, that a change of circumstances or the development of the country may require one in the near future.

Looking at all of the evidence, we cannot say that the jury placed an exaggerated estimate upon the injury inflicted upon the plaintiff.

Little Rock and Fort Smith Railway v. McGehee.

5. Satis-faction of judgment for damages: Effect of.
It has been suggested that the satisfaction of the judg-ment will not render the appropriation of the land legal, but that the company will remain liable to a succession of actions of trespass as for a continuing nuisance. This con-sequence would follow if the company had no right to build its road. In that case the road would be a nuisance—a perpetual nuisance; and every day's continuance of it would be a legal wrong, for which the company would be liable in damages after they have accrued. If, however, the company has not transcended the authority constitution-ally vested in it by the legislature, and yet, in constructing its road, has necessarily injured the rights of others, it is equally liable to respond for prospective as well as accrued damages, and it cannot be vexed in a second action. *Mahon v. N. Y. Cent. R. Co.*, *24 N. Y.*, *658*.

Judgment affirmed.

DISSENTING OPINION BY

EAKIN, J.    I am dissatisfied with the verdict in this case, and think there should be a new trial. It was evidently rendered on the ground that the plaintiff had a vested ferry franchise, which, but for the obstructions placed in his way by defendant, he could have made useful at an expense of about one hundred dollars, whereas now it would cost him five hundred dollars. There is no other evidence upon which a verdict of four hundred dollars can be rested.

In truth the plaintiff had no ferry there, nor license to keep one, and never had—neither he nor any one else. He owned the land upon the bank of the Arkansas river, over which the railroad track went down on an incline to the water, and which would have been a good place for a ferry. But there was another long established ferry near by, at the town of Van Buren, which is not shown to have been inade-quate to the demands of public convenience. He did not own the opposite bank. There was no public road leading

Little Rock and Fort Smith Railway v. McGehee.

to his ferry point. It could only be approached over lots of others in the town of Van Buren, and the consent of the owner of these lots could not be obtained. The plaintiff's lessee to whom a lease had been given for the purpose, had made an effort to get the road opened by proper authority, and had failed; and discouraged thereby, had not made any application to the county court for license. The land itself for any other purpose, had no estimable value.

Conceding the full authority of the case of *Boom Co. v. Patterson, 98 U. S.*, as applicable to the facts of that case, it does not determine this. It was not questioned in that case that the plaintiff might have got a license for a boom, nor did anything show any impediment to it, if the defendant company had not taken his island. The court simply held that the market value of the island for booming purposes, might be taken into account in measuring damages.

In this case, it would be impossible to say what, subject to the contingencies, the value of the plaintiff's land for ferrying purposes might be. It would be nothing if the county court should deem it not required for public convenience, or if he could not get a road laid off to it over the lands of others, who appear to have opposed it, and then it would have been only a right of ferriage from one bank, near by and in competition with an old established ferry, still in operation.

I cannot concur in holding that damages so remote and contingent can be estimated in an action in which no fraud, violence nor oppression is charged. It seems to obliterate all distinction in civil actions, between such damages as are direct and immediate, and such as are remote and contingent. It seems to say that inasmuch as plaintiff might possibly have obtained permission, sometime in the future, to work a ferry there, and might possibly have a public road established to run to it, that *therefore* the railroad company shall now pay him, as damages, the increased cost of making a road down the bank when needed.

The plaintiff had granted the right of way upon condition that the approaches to the ferry should not be injured, and the real gravamen is the injury to the approaches, rather than damage to the land itself, by entering and taking the right of way. Viewed therefore as an action of trespass, claiming injury to the land, of a permanent character, it would be proper to show the value of the land in market before the incline was built, and its value afterwards. Doubtless the chances of getting the assent of the county court to establish a ferry there, and the probability of having property of others condemned for a county road to reach it, and the probable costs of that by way of compensation, and the prospective value of a one-sided ferry in close competition with an old one, would all be elements either of damage or of market value. But the true test is what would the property have been actually worth in the existing state of things before the incline was built, and how much was it deteriorated. Not what it would have been worth "with the ferry privilege" and "without the ferry privilege."

A ferry franchise is a sovereign right at common law. It belongs to no citizen, whether riparian owner or not, until granted by the sovereign. It is not appurtenant to the soil, but the common law doctrine was that it ought not to be granted except to one who owned the bank. *Comyn's Dig. Title,* "*Piscary,*" (*B*), *Ferry.* Still there is no property in it till granted. Our statute has not altered the common law in that regard. In *Murray v. Menefee, 20 Ark., 561,* under our statute, the court announced that a ferry franchise is the creature of sovereign power, and that *no one* can exercise it without the consent of the state. This consent is given by the county court, and in giving or withholding it, the court exercises judicial discretion. When it has been granted it becomes a private vested right, (see same case), which the court says "the law will not

suffer to be infringed by a rival ferry unless public conve-
nience requires it; and not even then except "at or near
cities and towns." The court proceeds to say that the
establishment of a public ferry is not unfrequently attended
with heavy expenditures, and the grantee is held to the
strict performance of certain duties, and is subject to penal-
ties for neglect, "By making the privilege to some extent
exclusive the legislature, doubtless, intended to subserve
both *private rights* and public interests."

The *locus in quo* is near Van Buren where there is already
an established ferry. The owner of *that* franchise, too, is
entitled to be considered by the county court. He has
incurred probably, almost certainly, heavy expenditures to
subserve the public convenience, and exposed himself to
heavy penalties on default of duty to the public. There is
not a particle of proof that the public convenience requires
another ferry. It appears that no application had ever
been made to the county court for a ferry from plaintiff's
bank. It had been in contemplation and abandoned as a
hopeless enterprise.

It is possible that plaintiff on application to the county
court might show sufficient reasons, based on public conve-
nience, for granting him the franchise, but not being
advised as to the necessity or convenience, it is difficult to
say that he is entitled to it.

Still he recovered damages below as if his right was
unquestioned. I think that was error.