# SUPREME COURT OF ARKANSAS.

LITTLE ROCK & FORT SMITH RAILWAY COMPANY *v.*
ALISTER.

Opinion delivered February 8, 1896.

EMINENT DOMAIN—DAMAGES—PARTIES.—No allowance for damages
to a leasehold estate should be made in condemnation proceedings
where the lessees are not made parties.

EVIDENCE—OPINION OF NON-EXPERT.—The opinion of a witness as to
the cost of doing certain work is inadmissible where he has never
done such work, and it is apparent from his testimony that his
estimate is the result of guesswork.

Appeal from Franklin Circuit Court, Ozark District.

JEPHTHA H. EVANS, Judge.

STATEMENT BY THE COURT.

The petition in this case was filed by the railway
company for the purpose of condemning a right of way
100 feet wide through section 24, township 9 north,
range 26 west, in the county of Franklin. All proper
allegations were made and exhibits attached necessary
to entitle the plaintiff to have said land condemned.
The circuit judge ordered a deposit of $20 to be made,
to the end that work might begin at once. No answer
or reply to the petition was filed by defendants, but on
September 27, 1893, a trial was had, and a verdict ren-
dered for $2,000 against plaintiff. At the inception of
the trial it was admitted before the jury, and agreed to

by all parties, that the amount of land embraced in the right of way sought to be condemned was, in area, 2.84 acres, and that the actual value of the same was $30.

James Alister, one of the defendants, testified as follows: "The plaintiff's line of railway, recently built over the lands described in its complaint, runs where our tipple stood when we were working what is known as the 'Free Labor Slope,' which is situated in Franklin county, Ark., and 50 feet on the north side of its road, measuring from the center of the track, will extend 3 feet on to the dump of dirt and slate taken out of the mine in opening it, and deposited in front of the opening, which dump is about 240 to 260 feet long, extending east and west parallel with the road, and 50 feet wide from north to south, and is an average of 10 to 12 feet deep. From the outside or north line of said 50 feet right of way to the original opening or entry of said mine is 87 feet, and from that point to the present opening 35 feet. The tipple, where it originally stood, made a grade from the mine to it quite an easy road, so we could raise the coal from the mine to the tipple with the use of a mule. In order to work the mine now, it would require the removal of this dump, of dimensions before stated, which I think would cost $800 or $1,000. It would be necessary to do this in order to lay the three lines of railway track which would be necessary to deliver the coal on to the cars. The taking of such 50-foot right of way would necessitate the building of the tipple much further north, and near the opening or mouth of the slope; and, in order to make the tipple the required height, it would become necessary to raise the road leading into the mine an average of 25 feet for the distance of 150 feet back from the mouth of the mine. In order to do this, the top of the present opening would have to be shot or blasted down, and the road thus built up. Besides this, it would be necessary to build up the

road on the outside of the mine from the mouth of the
slope to the tipple, a distance of 72 feet, to correspond
with the raised condition of road inside the mine.    It
cost us $1,600 to make the opening or slope from the
surface down to the coal, and to thus take down the
top, and fill up, and elevate the road down the slope, as
above stated, would be more difficult and cost more than
to make the original opening.    I would fix the cost at
$1,600.    My testimony refers solely to what is known
as the 'Free Slope,' which is the only matter in contro-
versy, and has nothing to do whatever with what is
known as the 'Convict Slope,' situated some 300 yards
east of this slope.    The line between Johnson and
Franklin counties runs about midway between the two
slopes, leaving the Convict Slope in Johnson county and
the Free Slope in Franklin county, formerly so called
because the convicts were once worked in the Johnson
county slope, while the Franklin county slope was
worked by free labor.    My brother and co-defendant,
David Alister, and I own both of these mines, which
we leased to the Ouita Coal Company June 13, 1885, for
the term of twenty years.    For a time said company
worked both of these mines by convicts and free labor,
using both slopes ; but when the convicts were removed
from Coal Hill, they abandoned their work on the Free
Slope altogether, and have never worked it since, but
confined their operations solely to the Convict Slope,
which abandonment was some two or three years ago.
The tipple at the Free Slope was torn away by plaintiff
in building its line of railway over the line sought to be
condemned.    At the time we leased to the Ouita Coal
Company, there was no underground connection between
the two mines, but there was entry made by the said
company, after the convicts were removed, from the
convict into the free mine ; but since that time the props
and pillars have been taken out by the Ouita Coal Com-

pany in the western portion of the convict mine, adjacent to the free mine, and the roof has fallen in, till the connection between the two mines is closed, and that part of the convict mine is now abandoned. This will make it impracticable to make an entry from the convict mine into the free mine. Our lease to said company is still in force, and has about twelve years to run."

David Alister, another one of the defendants, testified, in substance, the same as James Alister, and further stated that he estimated the cost of removing the dump to be $700 to $800, and the cost of raising and making the road into the mine to be $1,200. And he added: "when plaintiff's engineer was locating its said road, I suggested that he run it about 50 feet south of where he located it, telling him that in that case we would charge nothing for the right of way, as it would leave our mines in condition to be operated, and would not, therefore, damage us to any considerable amount, but he refused to do so."

W. H. West also testified as follows: "I viewed the ground and assisted in measuring the distances as stated by James Alister in his testimony, which he stated correctly. I figured on the cost of removing the dump from the front of the slope. I have been in and about the mines a great deal, and have seen a good deal of this kind of work done. I understand the usual price for removing such material to be about 40 cents per square yard. At these figures it would cost about $2,000 to remove the dump. I would say that it would cost anyway $1,000 to $2,000, and to make the road into the mine as described by James Alister would cost $800 to $1,000." On cross-examination he stated: "I have never done any such work as I have spoken of in my examination in chief, either as a laborer or contractor, and what I stated as the price was only guesswork." The plaintiff moved the court to exclude the testimony

of this witness as being hearsay evidence. The court thereupon asked the witness: "Do you think you have had sufficient observation, and that you now have sufficient knowledge, of such work to enable you to form a fair opinion of its value?" The witness answered in the affirmative. The court then overruled the plaintiff's motion, and admitted the testimony of the witness, and the plaintiff at the time excepted.

*Dodge & Johnson* and *C. B. Moore* for appellant.

1. The verdict was contrary to the law and evidence. The actual value of the land taken was only $30. So the damages awarded for the *leased*, unworked and abandoned coal mine was $1970. This was excessive and outrageous. All the damages caused, if any, were caused by acts of the lessee, the Ouita Coal Company.

2. No damages to the leasehold of the Coal Company could be taken into consideration. Only damages to the reversion could be considered. 61 Miss. 631; 124 Penn. 297; 26 N. E. 577. Having leased to the Ouita Coal Company, they could recover for such damages as effected their expectant estate or reversion,— that is their interest after the termination of the lease. This could only be the value of the land taken, $30. 45 Ark. 252.

3. It was error to admit the testimony of W. H. West. His testimony was simply from hearsay, and was only guesswork.

*A. S. McKennon* for appellee.

1. If the Ouita Coal Company had any interest in the damages for taking the right of way, or in the slope, plaintiff should have made it a party, or at all events shown the extent of its interest, and how it originated. 45 Ark. 278.

2. There is no error in the declarations of law, prejudicial to appellant. The evidence is that the Coal Company had abandoned work, and did not contemplate working the Free Slope again.

3. There was no error in admitting West's testimony. The knowledge which qualifies a witness to testify as to value must necessarily consist largely of hearsay. 14 Am. & Eng. R. Cas. p. 186; 44 Ark. 258. But, if error, it was harmless, as the jury were controlled by the testimony of David Alister, which was supported by the testimony of Nugent and Caffray, both competent and disinterested witnesses.

*Damages in condemnation proceedings.* HUGHES, J., (after stating the facts). It will be seen from the evidence in this case that, at the time this cause was tried, the Ouita Coal Company had a lease on the coal mines to which the railway company condemned the right of way, and that the lease had twelve years to run. It will be observed also that the value of the land taken was only thirty dollars, and that the damages above this amount were for alleged injury to the mines. The lessees were not made parties to the proceeding, though they ought to have been. It will also be perceived that the evidence was directed to the damage done to the leasehold estate, as well as to the reversion, and that the jury gave damages in the largest possible amount that could have been given for the damages to the entire estate. This was error. No damages to the leasehold estate should have been allowed to be shown, or awarded to the appellees in this action. They are not entitled to recover for damages to the leasehold estate, but only for damages to the reversion, after the determination of that estate. The instruction given by the court is erroneous, being calculated to mislead the jury, and to leave it in doubt whether the court meant that they were at liberty to give the appellees damages for the injury to the whole estate, including the leasehold,

or for injury to the reversion only. It is easy to perceive that there would be a great difference in the amount of damages, for an injury to the reversion and the leasehold and reversion.

There was error also in admitting the testimony of West, which was only the opinion of a non-expert, whose testimony shows that he was guessing merely at what he testified to, and that his opinion was based upon hearsay, and that he really knew nothing about what he was testifying.

*Admissibility of opinion of non-expert.*

For the errors indicated, the judgment is reversed, and cause is remanded for a new trial.